# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQT Production Company, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 485 M.D. 2014 |
| | : | Argued: November 15, 2016 |
| Department of Environmental | : | |
| Protection of the Commonwealth | : | |
| of Pennsylvania, | : | |
| Respondent | : | |

**BEFORE:** **HONORABLE RENÉE COHN JUBELIRER, Judge**
**HONORABLE ROBERT SIMPSON, Judge**
**HONORABLE P. KEVIN BROBSON, Judge**

**OPINION BY JUDGE BROBSON** **FILED: January 11, 2017**

## I. INTRODUCTION

Before the Court for disposition is an Application for Summary Relief in this original jurisdiction matter. Petitioner EQT Production Company (EQT) seeks relief under the Declaratory Judgments Act[1] with respect to the Department of Environmental Protection's (Department) interpretation of certain penalty provisions under The Clean Streams Law.[2] For the reasons set forth below, we grant EQT's Application for Summary Relief.[3]

---

[1] 42 Pa. C.S. §§ 7531-7541.

[2] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-.1001.

[3] The Marcellas Shale Coalition and the Chamber of Commerce of the United States of America filed amicus curiae briefs pursuant to Pa. R.A.P. 531. Their arguments align closely with those advanced by EQT.

## II. BACKGROUND

For purposes of this Application for Summary Relief, the undisputed material facts are as follows. EQT owns and operates natural gas wells in Duncan Township on a gas well pad known as "Phoenix Pad S." EQT built a subgrade impoundment (Pad S Impoundment), which included an impervious synthetic membrane liner to contain the impaired water generated from hydraulic fracturing (*i.e.*, fracking). EQT concluded that it was likely that the Pad S Impoundment was leaking into the subsurface beneath the impoundment.

On May 30, 2012, EQT notified the Department of the leak. On June 11, 2012, within twelve days after notifying the Department, the Pad S Impoundment had been completely emptied of the impaired water and sludge. By June 15, 2012, EQT patched the liner and installed sumps and trenches at five locations downgradient from the Pad S Impoundment to collect and/or intercept groundwater that may be affected by the release. EQT also then entered into a formal cleanup process under the Land Recycling and Environmental Remediation Standards Act,[4] commonly referred to as Act 2. On September 27, 2012, EQT excavated the affected soils. EQT attained the Act 2 remediation standards for the soil beneath the Pad S Impoundment and continued its efforts to attain the Act 2 standards for the groundwater.

---

[4] Act of May 19, 1995, P.L. 4, 35 P.S. §§ 6026.101-.908. Under Act 2, a party is required to clean up soil or groundwater to certain risk-based standards that the Department has previously determined protect the environment. Act 2 does not require the remediator to entirely remove a released constituent from the environment, if even technically feasible, but rather provides a standard that, when met, releases a party from further cleanup liability for that constituent. *See* Section 501(a) of Act 2, 35 P.S. § 6026.501(a).

2

On May 9, 2014, the Department proposed a Consent Assessment of Civil Penalty for the leak, alleging violations of Sections 301, 307, and 401 of The Clean Streams Law.[5] The majority of the Department's $1,270,871 proposed settlement offer was based on "new, continuing, and ongoing impacts to the multiple waters of the Commonwealth" after the initial discharge from the Pad S Impoundment.

On September 19, 2014, EQT filed a Complaint in Action for Declaratory Judgment with this Court, seeking a declaration that the calculation of civil penalties under The Clean Streams Law by the Department was unlawful, to which the Department responded by filing preliminary objections. On October 7, 2014, the Department also filed a Complaint for Civil Penalties with the Environmental Hearing Board (Board). On February 20, 2015, this Court sustained preliminary objections by the Department and dismissed EQT's declaratory judgment action filed in this Court's original jurisdiction, reasoning that the harm was speculative because the Board had not yet made its penalty determination. *EQT Prod. Co. v. Dep't of Envtl. Prot. of Com.*, 114 A.3d 438 (Pa. Cmwlth.) (*EQT I*), *rev'd*, 130 A.3d 752 (Pa. 2015).

After this Court dismissed the Complaint in Action for Declaratory Judgment in *EQT I*, EQT appealed to the Supreme Court. On December 29, 2015, the Supreme Court reversed and remanded the matter for further proceedings. *EQT Prod. Co. v. Dep't of Envtl. Prot.*, 130 A.3d 752 (Pa. 2015) (*EQT II*). The Supreme Court concluded that the potential exposure to EQT, particularly given the lack of an administrative remedy for challenging the Department's

---

[5] 35 P.S. §§ 691.301, 691.307, and 691.401.

3

interpretation when EQT filed this action, "was sufficiently direct, immediate, and substantial to create a case or controversy justifying pre-enforcement judicial review via a declaratory judgment proceeding." *Id.* at 758-59.

Following remand in this matter, on February 19, 2016, EQT filed with this Court an Application for Interim Relief in the Form of a Stay of the action before the Board for the penalty determination. EQT argued that the resolution of the pending legal question regarding the validity of the Department's interpretation of Sections 301, 307, and 401 of The Clean Streams Law bore directly on the Board's decision for EQT's penalty amount and required a stay.

By order dated April 8, 2016, this Court denied the Application for Interim Relief. *EQT Prod. Co. v. Dep't of Envtl. Prot.* (Pa. Cmwlth., No. 485 M.D. 2014, filed April 8, 2016) (Colins, J.) (*EQT III*). The Court reasoned that a hearing before the Board was still necessary, because EQT will still be subject to penalties for the original discharge of fracking water and EQT had failed to show that a decision in this case would significantly alter the evidence at the Board hearing. The Court also reasoned that a stay in the Board's proceeding would seriously and indefinitely delay the Department's penalty complaint. Finally, this Court noted, "[i]f EQT wishes to obtain a resolution of the legal issue in this action from this Court prior to the [Board] hearing, it should file an application for summary relief in time to allow the [C]ourt to rule prior to the [Board] hearing and request that the matter be expedited." *Id.*, slip op. at 5.

On May 4, 2016, EQT filed with this Court its Application for Summary Relief, challenging the Department's interpretation of Sections 301, 307, and 401 of The Clean Streams Law. In support of its application, EQT attached as an exhibit a response by the Department to a discovery request by EQT filed in the

4

matter before the Board, where the Department elaborated on the penalty amount that the Department is currently seeking from EQT. The Department provided the following answer regarding the calculation of the penalty for the leak by EQT:

> Penalties for continuing violations were assessed under The Clean Streams Law for the continuing pollution to groundwater. Assuming the violations began on 4/30/2012 (the first date on which the Department has data showing the presence of pollution in groundwater), the continuing violations penalties began to accrue on the next day, 5/1/2012, up to and including the point at which the calculation was completed on 9/25/2014, a period of 878 days. The Department assessed continuing violations penalties at a rate of $5,000.00 per day (half the statutory maximum rate) for 878 days, for a total of $4,390,000.00. When continuing violations penalties are calculated for all five of the existing discharges at the site, at $10,000.00 per day, for Sections 301/307 and 401 of The Clean Streams Law, the proposed assessment through 9/25/2014 is $81,760,000.00.
> Note that while groundwater continues to be polluted, continuing violations penalties continue to accrue beyond 9/25/2014.

(Reproduced Record (R.R.) at 283a.)[6]

### III. STANDARD FOR SUMMARY RELIEF

Declaratory judgment actions within the Court's original jurisdiction fall within the scope of Chapter 15 of the Pennsylvania Rules of Appellate Procedure. *See* Pa. R.A.P. 1501(a)(3), 1532(b). "Summary relief under Pa. R.A.P. 1532(b) is similar to the relief envisioned by the rules of civil procedure

---

[6] The Court is uncertain as to how the Department calculated the total penalty figure that the Department provided in its response to EQT's discovery request. For this Application for Summary Relief, however, we note that it is undisputed that the majority of the $81,760,000 originates from the Department's contested interpretation that violations of The Clean Streams Law persist after the initial discharge of prohibited substances into waters of the Commonwealth.

governing summary judgment." *Brittain v. Beard*, 974 A.2d 479, 484 (Pa. 2009). "'An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute.'" *Jubelirer v. Rendell*, 953 A.2d 514, 521 (Pa. 2008) (quoting *Calloway v. Pa. Bd. of Prob. & Parole*, 857 A.2d 218, 220 n.3 (Pa. Cmwlth. 2004)).

The purpose of the Declaratory Judgments Act is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and [the Declaratory Judgments Act] is to be liberally construed and administered." 42 Pa. C.S. § 7541(a). An action brought under the Declaratory Judgments Act "'must allege an interest by the party seeking relief which is direct, substantial and present, . . . and must demonstrate the existence of an actual controversy related to the invasion or threatened invasion of one's legal rights.'" *Bowen v. Mount Joy Twp.*, 644 A.2d 818, 821 (Pa. Cmwlth.) (quoting *Pa. Institutional Health Servs., Inc. v. Dep't of Corr.*, 631 A.2d 767, 771 (Pa. Cmwlth.), *aff'd*, 640 A.2d 413 (Pa. 1994)), *appeal denied*, 652 A.2d 1326 (Pa. 1994). Granting or denying an action for a declaratory judgment is committed to the sound discretion of a court of original jurisdiction. *Gulnac by Gulnac v. S. Butler Cnty. Sch. Dist.*, 587 A.2d 699, 701 (Pa. 1991).

## IV. DISCUSSION

EQT challenges the Department's interpretation of Sections 301, 307, and 401 of The Clean Streams Law.[7] The Department interprets the above sections

---

[7] When interpreting a statute, this Court is guided by the Statutory Construction Act of 1972, 1 Pa. C.S. §§ 1501-1991, which provides that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby*, 842 A.2d 389, 400 (Pa. 2004). "When the words of a statute are
**(Footnote continued on next page…)**

6

of The Clean Streams Law as authorizing a penalty under a continuing violation theory for every day that industrial waste or a substance resulting in pollution *remains* in a water of the Commonwealth following the initial release of the waste or substance. EQT, by contrast, argues that a violation only occurs under Sections 301, 307, or 401 on the days that the industrial waste or substance resulting in pollution is discharged or enters from an area outside of the waters of the Commonwealth (*e.g.*, a factory, industrial site, railcar, etc.) into a water of the Commonwealth. Once the discharge or entry stops, no additional violations occur even if the previously released regulated substance continues to be present in the water. EQT essentially argues that the Department is reading language into these provisions to support its position. EQT further argues that these sections must be construed narrowly as penalty provisions. EQT also argues that prior cases from this Court and prior adjudications by the Board support its interpretation. Finally, EQT argues that the Department's interpretations would nullify Pennsylvania's Act 2 program for remediation.

---

**(continued…)**

clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory construction. 1 Pa. C.S. § 1921(c). "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Bethenergy Mines, Inc. v. Dep't of Envtl. Prot*., 676 A.2d 711, 715 (Pa. Cmwlth.), *appeal denied*, 685 A.2d 547 (Pa. 1996). Moreover, "[e]very statute shall be construed, if possible, to give effect to all its provisions." 1 Pa. C.S. § 1921(a). It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa. C.S. § 1922(2). Thus, no provision of a statute shall be "reduced to mere surplusage." *Walker*, 842 A.2d at 400. Finally, it is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa. C.S. § 1922(1).

In defense of its interpretation, the Department argues that under the statutory language of Sections 301, 307, and 401 of The Clean Streams Law, a violation occurs when industrial waste or a substance resulting in pollution flows from one water of the Commonwealth into another. The Department argues, alternatively, that if its interpretation is not supported by the clear language of the statute, then it is supported by the rules of statutory construction. Namely, the Department argues that these provisions are remedial, rather than punitive, and further the legislative intent of The Clean Streams Law. The Department also argues that the cases cited by EQT are distinguishable. The Department also avers that its interpretation is reasonable and, therefore, should be afforded deference. Finally, the Department argues that its interpretation is consistent with the Act 2 remediation scheme in that it only further incentivizes prompt cleanup after a violation of The Clean Streams Law.

### A. Statutory Framework

#### 1. *The Clean Streams Law*

The General Assembly's overarching intent in The Clean Streams Law is to protect the waters of the Commonwealth from pollution. *See* Section 4 of The Clean Streams Law, 35 P.S. § 691.4. Section 1 of The Clean Streams Law, 35 P.S. § 691.1, defines "waters of the Commonwealth" as follows:

> "Waters of the Commonwealth" shall be construed to include any and all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs and all other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth.

In furtherance of the overarching goal, The Clean Streams Law is organized to address particular types of pollution and potential pollution.

8

Article II of The Clean Streams Law regulates pollution resulting from "sewage."[8] As the title of the section suggests,[9] Section 201 of The Clean Streams Law generally prohibits the discharge[10] of sewage into the waters of the Commonwealth and also prohibits the entering of sewage into waters of the Commonwealth through other means:

> No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any sewage, except as hereinafter provided in this act.

Discharges, however, are allowed if permitted under Section 202 of The Clean Streams Law, 35 P.S. § 691.202. If not permitted, the discharge of sewage is "declared to be a nuisance." Section 202 of The Clean Streams Law.

In a similar fashion, Article III of The Clean Streams Law regulates pollution resulting from "industrial waste."[11] Section 301 of The Clean Streams

---

[8] "Sewage" is defined "to include any substance that contains any of the waste products or excrements or other discharge from the bodies of human beings or animals." Section 1 of The Clean Streams Law.

[9] We note that although not controlling, section headings "may be used to aid in the construction thereof." 1 Pa. C.S. § 1924.

[10] The Department's regulations define the term "discharge" as occurring where a pollutant is added "to *surface waters* of this Commonwealth *from a point source*," 25 Pa. Code. § 92a.2 (emphasis added).

[11] "Industrial waste" is defined to include

> any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined, and mine drainage, refuse, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal colleries, breakers or other coal processing operations. "Industrial waste" shall include all such substances whether or not generally characterized as waste.

**(Footnote continued on next page…)**

Law, titled "Prohibition against discharge of industrial wastes," prohibits the discharge of industrial wastes into the waters of the Commonwealth and also prohibits industrial waste entering the waterways of the Commonwealth through means other than discharge.  Specifically, Section 301 of The Clean Streams Law provides:

> No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any *industrial wastes*, *except as hereinafter provided in this act.*

(Emphasis added.)  Like discharges of sewage, however, discharges of industrial waste are allowed if permitted under the relevant provision of The Clean Streams Law.  Section 307(a) of The Clean Streams Law provides:

> No person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department.

Like unpermitted discharges of sewage, Section 307(c) of The Clean Streams Law further provides that "[a] discharge of industrial waste without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the department is hereby declared to be a nuisance."

Article IV of The Clean Streams Law addresses "other" types of pollution—*i.e.*, pollution resulting from a discharge or entry of something other

---

**(continued…)**

Section 1 of The Clean Streams Law.

than sewage and industrial waste into the waters of the Commonwealth. Section 401 of The Clean Streams Law provides:

> It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, *any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance.*

(Emphasis added.)[12]  Section 402 of The Clean Streams Law, 35 P.S. § 691.402, extends to the Department the authority to regulate any activities "not otherwise requiring a permit under this act"[13] that have the potential to pollute the waters of the Commonwealth by requiring that such activities only be conducted pursuant to permits issued by the Department.

---

[12] "Pollution" is defined as follows:

> "Pollution" shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The department shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.

Section 1 of The Clean Streams Law.

[13] This is an obvious reference to the discharge permit provisions for sewage and industrial waste in Sections 202 and 307 of The Clean Streams Law.

11

Enforcement is set forth in Article VI. Section 601(a) of The Clean Streams Law, 35 P.S. § 691.601(a), generally provides that "[a]ny activity or condition declared by this act to be a nuisance *or which is otherwise a violation of this act, shall be abatable in the manner provided by law or equity for the abatement of public nuisances.*" (Emphasis added.) Actions seeking abatement of nuisances can be brought in this Court's original jurisdiction or in the court of common pleas of the county "where the activity has taken place, the condition exists, or the public is affected." *Id.* In addition to seeking abatement in the courts of the Commonwealth under Section 601 of The Clean Streams Law, Section 602 of The Clean Streams Law, 35 P.S. § 691.602, provides that persons or municipalities that violate any provision of The Clean Streams Law may be subject to criminal penalties. The Department also may assess civil penalties, after a hearing, for violations "of a provision of this act, rule, regulation, order of the department, or a condition of any permit issued pursuant to" The Clean Streams Law. Section 605(a) of the Clean Streams Law, 35 P.S. § 691.605(a). The Clean Streams Law provides for specific penalties for violations that are connected with or related to mining[14] and sets forth the manner and requirements for the imposition of those civil penalties.[15] Section 605(b) of The Clean Streams Law,

---

[14] Section 1 of The Clean Streams Law, pertaining to definitions, provides that the term "'[m]ine' shall be construed to mean any coal mine, clay mine or other facility from which minerals are extracted from the earth including coal refuse disposal areas and coal collieries, coal breakers and other coal processing operations."

[15] Section 605(b)(3) of The Clean Stream Law, which applies to civil penalties for violations that are connected with or related to mining, provides:

> If the violation involves the failure to correct, within the period prescribed for its correction, a violation for which a cessation order, other abatement order or notice of violation has been issued, a civil penalty of not less than seven hundred fifty

**(Footnote continued on next page…)**

12

35 P.S. § 691.605(b). That section, which again relates to only violations connected with or related to mining, provides for the assessment of a civil penalty for a violation that "continues beyond the period prescribed for its correction."[16]

Additionally, Section 610 of The Clean Streams Law, 35 P.S. § 691.610, authorizes the Department to "issue such orders as are necessary to aid in the enforcement of [The Clean Streams Law]," including, "but not limited to, orders modifying, suspending or revoking permits and orders requiring persons or municipalities to cease operations of an establishment which, in the course of its operation, has a discharge which is in violation of any provision of this act." The Department's order may "require compliance with such conditions as are necessary to prevent or abate pollution or effect the purposes of [The Clean Streams Law]." Section 610 of the Clean Streams Law (emphasis added).

Finally, Section 701 of The Clean Streams Law, 35 P.S. § 691.701, makes clear that the collection of a penalty by the Department under Article VI does not estop proceedings in courts of law or equity to abate pollutions forbidden under the act or abate nuisances existing under law.

---

**(continued…)**

> dollars ($750) shall be assessed for each day the violation continues beyond the period prescribed for its correction: Provided, however, That correction of a violation within the period prescribed for its correction shall not preclude assessment of a penalty for the violation.

[16] When a written complaint is made to the Department, it is the duty of the Department "to investigate any alleged source of pollution of the waters of the Commonwealth, and to institute appropriate proceedings under [The Clean Streams Law] to discontinue any such pollution if the offense complained constitutes a violation of [The Clean Streams Law]." Section 604 of The Clean Streams Law, 35 P.S. § 691.604.

13

## 2. *Act 2*

Pennsylvania's Land Recycling Program is comprised of three companion acts, enacted simultaneously: Act 2; the Economic Development Agency, Fiduciary and Lender Environmental Liability Protection Act (Act 3), Act of May 19, 1995, P.L. 33, 35 P.S. §§ 6027.1-.14; and the Industrial Sites Environmental Assessment Act (Act 4), Act of May 19, 1995, P.L. 43, *as amended*, 35 P.S. §§ 6028.1-.5. Act 2 is the primary law under the Land Recycling Program and seeks to encourage brownfields redevelopment through uniform cleanup standards based on health and environmental risks, standardized review procedures, and release from liability. Act 2 provides the remediation standards for contamination under several state environmental statutes, including The Clean Streams Law,[17] and releases liability for further remediation once that standard is achieved. The broad release of liability under Act 2 includes current and future owners and precludes liability from lawsuits brought by citizens or contribution actions brought by responsible persons.[18] Section 501 of Act 2, 35 P.S. § 6026.501.

In 2004, the Department entered into an agreement with the Environmental Protection Agency, which provides, in part, that a remediation that complies with the Act 2 standards will satisfy the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§

---

[17] *See* Section 106 of Act 2, 35 P.S. § 6026.106.

[18] Act 3 provides lenders that finance a recycled brownfield protection from clean-up liabilities as long as their participation did not cause the contamination. Act 4 allocates funds for grants to conduct assessments for brownfields.

9601-9675, and the federal government will refrain from commencing an action under any related federal regulations.[19] Thus, if a party achieves attainment of Act 2 remediation, that party will not face any further liability for cleanup under The Clean Streams Law or any of the related state or federal statutes.

## B. Confinement of Our Analysis

The issue of statutory analysis presented here, as phrased by the Department, is whether, under the above scheme, every time a person "allow[s] his, her, or its industrial waste or pollutional substance to flow from one water of the Commonwealth into another water of the Commonwealth," the person is committing a new and separate violation of Section 301, 307, and/or 401 of The Clean Streams Law. (Dep't's Br. at 10.) If so, every such violation can be assessed as a separate civil penalty under Section 605(a) of The Clean Streams Law. The Department cites to the Pennsylvania Supreme Court's decision in *Commonwealth v. Harmar Coal Co.*, 306 A.2d 308 (Pa. 1973), *appeal dismissed*, 415 U.S. 903 (1974), in support of its interpretation.

Based on the undisputed facts noted above, the dispute here revolves around a release of impaired water and sludge from an industrial site—*i.e.*, a natural gas well pad wastewater impoundment. Under the Department's regulations, the wastewater impoundment, from which the industrial waste leaked,

---

[19] Shari Shapiro, *The Effectiveness of Pennsylvania's Act 2: Are Good Mechanics Enough?*, 24 Temp. J. Sci. Tech. & Envtl. L. 441, 448 (2005). Attainment of Act 2 remediation also satisfies the Resource Conservation and Recovery Act (RCRA), 42 U.S. C. §§ 6901-6992k, and the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601-2697. DEP Fact Sheet: *Overview of the Land Recycling Program* at 2.

15

meets the definition of a "point source."[20]  Because the release emanated from an industrial site, the waste at issue is considered industrial waste, regulated under Article III of The Clean Streams Law, and not Article IV (relating to other forms of pollutants).  Our analysis, therefore, will focus on interpreting this article of The Clean Streams Law.

As noted above, Sections 301 and 307 of The Clean Streams Law work in tandem.  The first provides a general rule prohibiting pollution through the release of industrial waste, and the second provides for a process by which a municipality or person can obtain a permit to "discharge" residual waste into the waters of the Commonwealth.  As discussed above, according to the Department's regulations, a "discharge" occurs where a pollutant is added "to *surface waters* of this Commonwealth *from a point source*."  25 Pa. Code. § 92a.2 (emphasis added).  Here, the industrial waste from the wastewater impoundment initially infiltrated groundwater, not surface water.  Accordingly, the pollution in question does not meet the definition of a "discharge" and, therefore, is not regulated by Section 307 of The Clean Streams Law.  Thus, our analysis shall be confined to proper application of Section 301 of The Clean Streams Law for purposes of imposing civil penalties.

---

[20] A "point source" is defined as "[a] discernible, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, [Concentrated Aquatic Animal Production Facility (CAAP)], [Concentrated Animal Feeding Operation (CAFO)], landfill leachate collection system, or vessel or other floating craft, from which pollutants are or may be discharged."  25 Pa. Code § 92a.2.

16

## C. Interpretation of Section 301 of The Clean Streams Law

As noted above, Section 301 of The Clean Streams Law prohibits not only a discharge, "except as hereinafter provided in this act," but also prohibits placing industrial waste, permitting industrial waste to be placed, permitting industrial waste to flow, or continuing to permit industrial waste to flow "into any of the waters of the Commonwealth." EQT claims that it stopped any such illegal activity once it completely emptied the leaking impoundment of impaired water and sludge. The Department claims that the illegal activity continues so long as the leaked industrial waste exists in *any* water of the Commonwealth—*i.e.*, until the released industrial waste is entirely abated in accordance with the standards set forth in Act 2.[21] Until that time, violations and civil penalties will continue to accrue.

With regard to Section 301 of The Clean Streams Law's prohibitions, as we noted above, the Department's regulations expressly define the term "discharge" as occurring where a pollutant is added "to *surface waters* of this Commonwealth *from a point source*." 25 Pa. Code. § 92a.2 (emphasis added). Thus, it is clear that Section 301 prohibits the entry of industrial waste into the surface waters of the Commonwealth through a point source. The General Assembly, however, also prohibited a person from "plac[ing] or permit[ting] to be placed, or . . . permit[ting] to flow, or continu[ing] to . . . permit to flow, into any of the waters of the Commonwealth" industrial waste. 35 P.S. § 691.301. Through

---

[21] Section 106(a) of Act 2, 35 P.S. § 6026.106(a), provides that whenever site remediation is required under, *inter alia*, The Clean Streams Law, the Act 2 environmental remediation standards apply. As noted above, EQT has fully remediated any soil contamination and continues to remediate groundwater contamination.

17

the inclusion in Section 301 of the language "plac[ing] or permit[ting] to be placed, or . . . permit[ting] to flow, or continu[ing] to . . . permit to flow, into any of the waters of the Commonwealth," it appears that the General Assembly intended to expand Section 301's prohibition not only to discharges of industrial waste into surface waters, but also to instances where industrial waste enters into the Commonwealth's groundwater or surface waters through other means. *See id.* This interpretation would cover situations where industrial waste escapes containment and flows over land into surface waters or leaks into the soil and enters the Commonwealth's groundwater. Thus, Section 301's prohibition applies to situations such as here, where industrial waste leaked from a compromised subgrade impoundment into the subsurface beneath the impoundment, making its way to the groundwater. In fact, the parties do not disagree that Section 301 prohibits such pollution. The parties disagree, however, as to whether further movement of the industrial waste and its mere presence in groundwater or other bodies of water that make up the waters of the Commonwealth are also violations.

The Department essentially asks the Court to conclude that, following an initial release of industrial waste into a water of the Commonwealth, the natural flow of the waste from that water into another water of the Commonwealth or *part* thereof constitutes a violation (*e.g.*, the flow of industrial waste from part of a stream to another part of that same stream or to a river would result in a continuing violation), because a person or municipality, through the initial release of that industrial waste, allowed or permitted the waste to flow or continue to flow from one water of the Commonwealth to another. The Department's interpretation focuses partly on the definition of "waters of the Commonwealth," which includes "all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm

18

sewers, lakes, dammed water, ponds, springs and all other bodies or channels of conveyance of surface and underground water, *or parts thereof.*" 35 P.S. § 691.1 (emphasis added). The Department argues that the inclusion of the various "parts" of waters of the Commonwealth indicates that the General Assembly intended to prohibit the entrance of unpermitted industrial waste into each individual category of water. The Department also stresses the dynamic, rather than static, nature of the hydrogeologic regime that encompasses the "waters of the Commonwealth." (Dep't's Br. at 13-15).

Furthermore, the Department maintains that its interpretation is consistent with Act 2, because the continuing violation creates incentive for aggressive, prompt, thorough cleanup, whereas the consequence of EQT's interpretation would be the elimination of any legal obligation to clean up contaminated waters, which would vitiate the declared legislative purpose to restore to a clean, unpolluted condition every stream in Pennsylvania.

EQT, on the other hand, focuses on the portion of Section 301 of The Clean Streams Law that prohibits a person or municipality from permitting industrial waste to flow or continue to flow "*into* any of the waters of the Commonwealth." (Emphasis added.) EQT takes the position that industrial waste enters "into" the waters of the Commonwealth when it first enters one of the types of waters enumerated in the definition of "waters of the Commonwealth." EQT contends that after that initial entry, however, movement of the industrial waste from one water to another water is not prohibited, because the various enumerated waters all make up "the *waters* of the Commonwealth." In other words, once the industrial waste enters into one water of the Commonwealth, it has entered "the *waters* of the Commonwealth," such that Section 301's prohibition does not

19

encompass the movement of the industrial waste after its initial entry. EQT notes that the industrial waste is not entering "into" the water from an outside source when it moves from one water to another.

The Department's interpretation of Section 301 of The Clean Streams Law as providing that a violation occurs when industrial waste flows from one water of the Commonwealth into another and continues to constitute a violation until remediation is completed is not supported by the statutory provisions and framework or the rules of statutory construction. The Department's interpretation would result in potentially limitless continuing violations for a single unpermitted release of industrial waste while *any* of the waste remained in any water of the Commonwealth, or until Act 2 remediation is completed. Moreover, if a new violation occurs as industrial waste moves from one water of the Commonwealth to another water or part thereof, it would be impossible for the Department to prosecute a case without the Commonwealth of Pennsylvania first delineating all of the boundaries for each water and each *part* thereof. The General Assembly did not intend for these sections to establish seemingly endless violations following but a single release of industrial waste or other prohibited substances from a point source or otherwise into a water of the Commonwealth.

Moreover, the Department's interpretation ignores the fact that violations require some culpable action or inaction by the polluter. After all, the Department has the power to impose civil penalties for *each* violation under Section 605(a) of The Clean Streams Law. Civil penalties are designed to punish wrongful conduct, as the Department concedes in its brief. (Dep't's Br. at 25.) Indeed, Section 605(a) of The Clean Streams Law requires the Department, in seeking a civil penalty, to consider a number of factors, including the willfulness of

20

the violation. The Department's interpretation focuses on the passive movement of the industrial waste, not the actions of the party that released the waste.

Had the General Assembly intended that a violation of Section 301 of The Clean Streams Law would result in a continuing violation until remediation is achieved, the General Assembly would have clearly stated such. The absence of such language is striking given the inclusion in Section 605(b) of The Clean Streams Law of a continuing civil penalty for certain violations relating to mining "for each day the violation continues *beyond* the period prescribed for its correction."[22] (Emphasis added.)

To rule otherwise would be tantamount to punishing a polluter indefinitely, or at least for as long as the initially-released industrial waste remains in the waters of the Commonwealth, for the same violation—*i.e.*, the initial release.[23] *See* 1 Pa. C.S. § 1928 (requiring courts to strictly construe penal provisions in statute). Such a ruling would vastly expand potential liability in Pennsylvania, even when a polluter is taking aggressive steps to remediate.

---

[22] This provision also suggests that violations do not continue following an initial release during a time period during which corrective action is being taken.

[23] The Department's interpretation is not entitled to deference. Generally speaking, the courts "defer to the expertise of the agency upon which the General Assembly has vested enforcement or interpretive responsibilities." *Packer v. Bureau of Prof'l & Occupational Affairs*, 99 A.3d 965, 969 (Pa. Cmwlth. 2014) (citing Section 1921(c)(8) of the Statutory Construction Act, 1 Pa. C.S. § 1921(c)(8)), *appeal denied*, 109 A.3d 680 (Pa. 2015). Deference is not given, however, to agency interpretations which are erroneous or which frustrate legislative intent. *Id.* As explained above, the clear language of the statute and the rules of statutory construction lead us to conclude that the Department's interpretation is not consistent with the legislature's intent. Moreover, deference is not given when an agency interprets a statute to justify its position in litigation. *ARIPPA v. Pa. Pub. Util. Comm'n*, 792 A.2d 636, 660 (Pa. Cmwlth. 2002).

The Department must confine its actions to the statutory framework of The Clean Streams Law, recognizing that Section 301 of The Clean Streams Law does not provide for a violation based upon the movement of industrial waste from one water of the Commonwealth to another. Rather, a violation of Section 301 occurs when a person or municipality does what is prohibited—*i.e.*, allows industrial waste to enter into the waters of the Commonwealth—and once it ceases that conduct, violations cease. Section 301's prohibition is not a mandate to accomplish full remediation or to complete the Act 2 remediation process, and, therefore, the failure to remediate cannot equate to a violation of Section 301. This does not mean that there are no consequences for leaving industrial waste in the waters of the Commonwealth following a release, because an action at law or in equity seeking abatement of nuisances can be brought for "[a]ny activity or condition declared by this act to be a nuisance *or which is otherwise a violation of this act*." 35 P.S. § 691.601(a) (emphasis added). Additionally, the Department is authorized to "issue such orders as are necessary to aid in the enforcement of [The Clean Streams Law]," including, "but not limited to, orders modifying, suspending or revoking permits and orders requiring persons or municipalities to cease operations of an establishment which, in the course of its operation, has a discharge which is in violation of any provision of this act." 35 P.S. § 691.610. The Department's order may "require compliance with such conditions as are necessary to prevent or abate pollution or effect the purposes of [The Clean Streams Law]." *Id.*

The Pennsylvania Supreme Court's decision in *Harmar Coal Company* does not compel a different interpretation. *Harmar Coal Company* was a consolidated appeal from two decisions issued by this Court, involving mine

22

drainage permits under a prior version of The Clean Streams Law. Relevant to this appeal is the portion of the case dealing with Pittsburgh Coal Company's (PCC) request for a permit to discharge 3.44 million gallons per day of acid mine drainage from one of its mines into a surface water of the Commonwealth. Some of the polluted water (2.17 million of the 3.44 million gallons per day) in PCC's mine migrated from other mines, termed "fugitive water." PCC proposed only to treat that portion of the discharged polluted water that emanated from its mine, or 1.27 million gallons, contending that the fugitive water, once discharged pursuant to the permit, could not constitute pollution because it was already polluted underground. This Court accepted that argument. On appeal, the Supreme Court reversed. The Supreme Court held:

> Water polluted underground can itself pollute the surface water into which it is discharged. Nothing in [T]he Clean Streams Law justifies the [Commonwealth] Court's holding that pollution occurs [o]nly when polluting substances are "first discharged into [a]ny 'waters of the Commonwealth'," in this case the underground pool. Appellant argues, and we agree, that the critical and principal illegal conduct under The Clean Streams Law is the discharge into the surface water.

*Harmar Coal Co.*, 306 A.2d at 315.

Under *Harmar Coal Company*, then, the issue was whether a mine operator was required to treat water already polluted by someone else before discharging it itself under a prior version of The Clean Streams Law. The Supreme Court answered affirmatively.

## V. CONCLUSION

Based on the allegations in the Petition for Review, we will issue declaratory relief only with respect to the proper interpretation of Section 301 of The Clean Streams Law. For the reasons set forth above, we hold that Section 301

23

of The Clean Streams Law is a provision that prohibits acts or omissions resulting in the initial active discharge or entry of industrial waste into waters of the Commonwealth and is not a provision that authorizes the imposition of ongoing penalties for the continuing presence of an industrial waste in a waterway of the Commonwealth following its initial entry into the waterways of the Commonwealth. EQT's Application for Summary Relief, therefore, is granted in this regard.

P. KEVIN BROBSON, Judge

Judge Wojcik did not participate in the decision of this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

EQT Production Company,                      :
                                 Petitioner      :
                                               :
        v.      :  No. 485 M.D. 2014
                                               :
Department of Environmental      :
Protection of the Commonwealth      :
of Pennsylvania,      :
                             Respondent      :

# **O R D E R**

AND NOW, this 11th day of January, 2017, the Application for Summary Relief filed by Petitioner EQT Production Company is hereby GRANTED in accordance with the accompanying opinion.

_____
P. KEVIN BROBSON, Judge