**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| EQT PRODUCTION COMPANY, | : | No. 6 MAP 2017 |
| | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court at 485 MD 2014, |
| | : | dated 1/11/17 |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF ENVIRONMENTAL | : | |
| PROTECTION OF THE | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| | : | ARGUED: November 28, 2017 |
| Appellant | : | |

**OPINION**

**CHIEF JUSTICE SAYLOR**                    **DECIDED: March 28, 2018**

In this direct appeal, we consider the scope of a civil penalty applicable to violations of environmental protection statutes regulating the entry of contaminants into any of the waters of the Commonwealth.

**I. Background**

Under the Clean Streams Law,[1] the unpermitted release of industrial waste and other contaminants into any of the waters of the Commonwealth is prohibited. Section 301 of the enactment provides:

---

[1] Act of June 22, 1937, P.L. 1987 (as amended, 35 P.S. §§691.1 - 691.1001).

No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act.

35 P.S §691.301. Section 307 restates this prohibitory language in somewhat different terms, forbidding persons and municipalities from "discharg[ing] or permit[ting] the discharge" of industrial wastes "in any manner, directly or indirectly" into any of the waters of the Commonwealth, absent authorization under DEP rules and regulations or without a permit. *See id.* §691.307. Section 401 -- which begins with an introductory title "[p]rohibition against other pollutions" -- makes it unlawful for persons or municipalities to "put or place" or "allow or permit to be discharged from property owned or occupied by such person or municipality" into any of the waters of the Commonwealth "any substance of any kind or character resulting in pollution." *Id.* §691.401.

In the Clean Streams Law, the term "Waters of the Commonwealth" is defined very broadly to encompass "any and all" of an extensive series of waters, including rivers; streams, creeks, springs and rivulets; lakes and ponds; water courses; and ditches, as well as "all other bodies or channels or conveyance of surface and underground water, or parts thereof, whether natural or artificial." *Id.* §691.1. Per Section 605, violators are subject to civil penalties of up to $10,000 per day for each violation. *See id.* §691.605(a).

The present litigation is a declaratory judgment proceeding initiated by Appellee EQT Production Company ("EQT"), which became exposed to the civil penalties under the Clean Streams Law in 2012 on account of leaks from an impoundment used to

contain impaired water flowing back from hydraulic fracture gas wells.[2]  According to the complaint, much of the penalty exposure asserted by the regulatory agency, the Department of Environmental Protection ("DEP" or the "Department"), which is the appellant herein, was premised on a "continuing violation" theory predicated on passive migration of contaminants from soil into water.  EQT asserted:

> DEP's articulated legal position to support this proposed penalty is that every day that contaminants from the [impoundment] *remain* in the subsurface soil and passively enter groundwater and/or surface water constitutes a "continuing violation" of sections 301, 307 and 401 of the Clean Streams Law, for which a separate civil penalty may be assessed for each day of alleged violation.

Complaint in *EQT Prod. Co. v. DEP*, No. 485 M.D. 2014 (Pa. Cmwlth.), at ¶21 (emphasis in original).  The company expressed the concern that DEP's soil-to-water theory "means that civil penalties may be asserted against [EQT] as long as *any* contaminant remains in the environment," creating significant uncertainty and potentially unending civil liability.  *Id.* at ¶35 (emphasis in original).  EQT contended that such position was contrary to the plain wording of the governing statutes, was not supported

---

[2] Some of the factual circumstances surrounding the leaks and their aftermath are disputed in a number of respects, but they are immaterial to our present review of issues of governing law.  Subject to clarifications provided below, more specific information can be gleaned from *EQT Production Co. v. DEP*, 634 Pa. 611, 130 A.3d 752 (2015), as well as in the Commonwealth Court's decision underlying this appeal. *See EQT Prod. Co. v. DEP*, 153 A.3d 424 (Pa. Cmwlth. 2017).  There is no dispute, however, that contaminated water generated in unconventional gas well operations constitutes "industrial waste" for purposes of Section 301.  *See* 35 P.S. §691.1 (prescribing a broad definition for this term to include a broad range of substances resulting from manufacturing or industrial activity).

by any judicial precedent, and defeated the legislative intent of Act 2 of 1995,[3] a separate enactment centered on environmental remediation.

In terms of an affirmative statement of its own interpretation of the statutory overlay, EQT indicated:

> Sections 301, 307 and 401, in conjunction with section 605 of the Clean Streams Law, 35 P.S. §691.605 (establishing civil penalty amounts for violations) grant DEP authority to assess a civil penalty *only* for the days that pollutants were actually *discharged from* the [impoundment], not for any days that previously released constituents passively migrate through the environment into groundwater or surface water.

Complaint in *EQT Prod. Co.*, No. 485 M.D. 2014, at ¶32 (emphasis in original).

Shortly after the filing of the complaint, the Department lodged a civil penalty complaint against EQT in the Environmental Hearing Board (the "EHB" or the "Board"), seeking imposition of a sanction of at least $4,532,296. Relevant to the progress of the declaratory judgment litigation as discussed below, various paragraphs of the complaint asserted that penalties continued to accrue for each day that a contaminant deriving from the impoundment "continues to be present in any waters of the Commonwealth." Complaint in *In re EQT Prod. Co.*, No. 2014-140-CP-L (EHB), at ¶¶60, 89.

In its answer and new matter addressing EQT's complaint for declaratory relief,[4] the Department observed that the relevant provisions of the Clean Streams Law do not employ the phrase "actual discharge" and highlighted EQT's failure to provide a definition for the term that it employed. *See* Answer and New Matter in *EQT Prod. Co.*,

---

[3] *See* Act of May 19, 1995, P.L. 4, No. 2 (as amended, 35 P.S. §§6026.101 - 6026.908).

[4] The Commonwealth Court initially dismissed the declaratory judgment action on the Department's preliminary objections. This Court reversed that decision, however, *see EQT Prod. Co.*, 634 Pa. 611, 130 A.3d 752, and the agency proceeded to file an answer and new matter.

No. 485 M.D. 2014, at ¶¶43, 44 ("The Department does not know what [EQT] views to be an 'actual discharge.'"). The agency also criticized any suggestion that penalty liability cannot be based upon "passive migration." *Id.* at ¶45. Furthermore, the Department charged that EQT had unfairly characterized the agency's liability theories and posited that the company's asserted omissions "compel the Department to articulate its legal position in full detail." *Id.* at ¶21.

DEP then described EQT's penalty exposure as follows. The agency explained that evidence would demonstrate that: industrial waste from the company's impoundment remained in bedrock and soil beneath the impoundment's liner for a period of time longer than EQT contemplated in its portrayal of an "actual discharge"; industrial waste can bind to the soil or perch above an aquifer, "continually polluting new groundwater as groundwater flows through the column of bound or perched industrial waste"; EQT's "plume of pollution . . . progressively and over time moved into regions of uncontaminated areas of surface and groundwater"; and this would continue for months or years. *Id.* ¶¶56-59. In these passages, DEP appears to have been advancing its soil-to-water migration theory, the continuing-violation theory such as was the subject of the complaint. The passages can also be read more broadly, however, to suggest new infractions as contaminants spread from discrete bodies of water into new regions of water, a water-to-water theory of serial violations upon which the Department would come to focus upon more specifically. Even more broadly, the Department charged that EQT was subject to civil penalties for "[e]ach day that [the company's] impact upon a water of the Commonwealth constitutes 'pollution'" and on each day that the industrial waste that was to be contained in the impoundment impairs waters of the Commonwealth. *Id.* at ¶¶71-72.

EQT proceeded to file an application for summary relief premised on discounting only the last and broadest formulation by DEP. *See* Pa.R.A.P. 1532(b). According to the company, DEP's pleadings and discovery responses conveyed its intention to seek civil penalties for every day that any contaminants deriving from the company's impoundment "remain in the environment." Application for Summary Relief in *EQT Prod. Co.*, No. 485 M.D. 2014, at ¶13. EQT criticized such an interpretation, indicating that the relevant substantive provisions of the Clean Streams Law turn upon entry of a contaminant "*into* a water of the Commonwealth." *Id.* at ¶14 (emphasis in original). It was the company's position at this stage that:

> Under the express text of the [Clean Streams Law], there is no violation for days on which an industrial waste or a substance resulting in pollution, after having previously been discharged *into* a water of the Commonwealth, *continues to be present in* that water.

Application for Summary Relief in *EQT Prod. Co.*, No. 485 M.D. 2014, at ¶15 (emphasis in original). Ultimately, EQT asked only for two facially straightforward pronouncements of declaratory relief. First, the company requested a declaration that a violation of the relevant substantive provisions of the Clean Streams Law occur only on a day in which a person "allows an industrial waste or a substance resulting in pollution to actually enter into waters of the Commonwealth." *Id.* at ¶18(a). Second, EQT asked the court to confirm that the mere presence of an industrial waste or a substance resulting in pollution of the waters of the Commonwealth does not, in and of itself, constitute a violation. *See id.* ¶18(b).

It is worth pausing at this juncture to consider that there is no material dispute that the second of these propositions is true. While DEP has repeatedly declined to squarely confirm that it will not seek penalties for the *mere* presence of contaminants in waters of the Commonwealth, every theory of a continuing violation or serial violations

that the agency has ever attempted to defend on developed reasoning contemplates *movement* of contaminants into or within water. *See, e.g.*, Brief for Appellant at 18 (couching liability under Sections 301, 307 and 401 in terms of an initial discharge or "the unpermitted continuing or indirect *flow*" of contaminants (emphasis added)); *accord* Brief of *Amicus* Clean Air Council at 21 (recognizing that "[t]he 'presence' of water pollutants . . . is not a legal standard for liability under Section 301."); Brief for *Amici* Citizens for Pennsylvania's Future and Sierra Club at 8 n.8 ("*Amici Curiae* do not read [sic] the Department as having taken the position below that the continued presence of the industrial waste in a particular water of the Commonwealth, *by itself*, is an ongoing violation of Section 301[.]" (emphasis in original)). Indeed*,* all of the statutes under review plainly contemplate such movement as a predicate for violations. 35 P.S. §§691.301 (prohibiting various forms of releases of industrial waste "*into* any of the waters of the Commonwealth" (emphasis added), 691.307 (same), 691.401 (same for substances resulting in pollution).[5]

As to the other proposition advanced in the summary-relief application -- *i.e.*, that an infraction occurs only on days when a violator allows a contaminant to actually enter into waters of the Commonwealth -- the parties' submissions also suggest a substantial overlap in the common understanding. The consensus is, again, in the degree to which

---

[5] *Amicus* Clean Air Council acknowledges that flow, and not mere presence, is the relevant litmus, but asks that we make clear that the presence of pollutants in a water may constitute *evidence* of a prohibited flow. *See* Brief for *Amicus* Clean Air Council at 19-26. It is a matter of common sense that the presence of a contaminant in water that is traceable to a particular source is circumstantial proof that the substance moved from the source into the water, and the same holds true as the substance might migrate through various waters. This, of course, does not answer the question whether serial civil penalties under the Clean Streams Law accrue based on continued migration of contaminants through waters, which is the matter upon which the declaratory judgment proceedings have come to focus.

movement into water is essential to a violation. The differences are, first, whereas EQT phrased the act or omission giving rise to liability as "*allow*[*ing*] a contaminant to actually enter into waters of the Commonwealth," DEP supplements the phrase to encompass a variety of other terms such as discharges, continued discharges, indirect discharges, permits to flow, and continuing to permit to flow. *See, e.g.*, Brief for Appellant at 22, 24-25. Second, DEP has stressed that the governing statutes contemplate movement not just "into waters," but into "*any* of the waters" of the Commonwealth. *Id.* at 24 (emphasis adjusted).

The substance of the application for summary relief, however, cannot fairly be understood to discount DEP's broader view in these regards, or, more specifically, either of its soil-to-water or water-to-water migration theories, both of which require movement into a water (or a part thereof). For example, there was no developed suggestion, in EQT's application or its initial supporting brief, concerning any distinction between active and passive conduct, or on a constrained definition of the concept of "allowing" movement into water. Moreover, EQT asserted that there could be no violation, once a contaminant has moved into a water, for mere presence in "*that* water," Application for Summary Relief in *EQT Prod. Co.*, No. 485 M.D. 2014, at ¶15 (emphasis added), thus avoiding any tension with the water-to-water theory. Furthermore, EQT did not carry over, from its complaint and into the application for summary relief, the notion of an "actual discharge" from the impoundment.

For these reasons, and otherwise, the application can be reasonably read only as an effort to confirm that the mere presence of contaminants in the environment does not, in and of itself, establish a violation, and that movement into water is a touchstone. Indeed, had the Department merely acceded to summary relief on the precise terms

advanced by EQT, it would have been untenable for the company to claim that the court had confirmed anything other than these modest propositions.[6]

The Department opposed summary relief. In its response, the agency observed -- consistent with the above summary of the EQT's application for summary relief relative to the soil-to-water and water-to-water theories -- that the application failed to challenge any portion of the agency's legal theories. *See* Answer to Application for Summary Relief in *EQT Prod. Co.*, No. 485 M.D. 2014, at 6. Notably, in neither the pleadings nor its response to the application for summary relief did the Department include a request for a declaratory judgment in its favor on the theories that it had interjected into the summary relief proceedings. Rather, the Department merely asked that relief on the complaint and application should be denied. *See* Answer and New Matter in *EQT Prod. Co.*, No. 485 M.D. 2014, at 26; Answer to Application for Summary Relief in *EQT Prod. Co.*, No. 485 M.D. 2014, at 12. Nevertheless, in a supporting brief, DEP proceeded to reframe, and to greatly broaden, the questions before the court on

---

[6] This is not to say that the Department could not have been justifiably concerned that a verbatim judicial pronouncement on the specific terms proposed by EQT in this highly technical area of the law could potentially be misused. Our only objective, at this point, is to clarify that the scope of the summary-relief application itself was quite limited. Along these lines, for example, EQT chose not to develop any rationale in pursuit of its original request, as stated in its complaint, for declaratory relief to discount the soil-to-water theory of continuing violation. Nor did the company present any rationale challenging any other theory of liability beyond one based on the mere presence of a contaminant in a protected water.

Consistent with the application for summary relief, EQT's initial supporting brief set out to vindicate its position on the twin pillars of the request for declaratory relief set forth in its application for summary relief, namely, that actual entry into waters of a contaminant the Commonwealth is essential to a violation; and the mere presence of a contaminant in waters of the Commonwealth does not, in and of itself, constitute a violation. *See* Brief in Support of Application for Summary Relief in in *EQT Prod. Co.*, No. 485 M.D. 2014, at 11-13 (presenting a summary of the argument).

summary review to advance its soil-to-water theory of a continuing violation, as well as the water-to-water theory of serial violations. *See, e.g.*, Brief in Opposition to Application for Summary Relief in *EQT Prod. Co.*, No. 485 M.D. 2014, at 1-2 (presenting a counter-statement of the questions presented).

In a reply brief, EQT for the first time contested the water-to-water theory, characterizing it as a novel, "revised continuing violation theory." Reply Brief in Support of Application for Summary Relief in *EQT Prod. Co.*, No. 485 M.D. 2014, at 1.[7] In this submission, EQT still did not specifically discuss the soil-to-water theory that was the subject of its original complaint, but which the company did not itself carry forward into the summary relief proceedings.

Upon its review, the Commonwealth Court accepted the Department's reframing of the issues, at least in part, centering its decision on the water-to-water theory. *See EQT Prod. Co.*, 153 A.3d at 433 ("The issue of statutory analysis presented here, as phrased by the Department, is whether . . . every time a person 'allow[s] his, her, or its industrial waste or pollutional substance to flow from one water of the Commonwealth into another water of the Commonwealth,' the person is committing a new and separate violation[.]"). Notably, and presumably in light of the parties' ultimate focus on that theory, the court also afforded no specific attention to the soil-to-water theory.

In its analysis, preliminarily, the Commonwealth Court proceeded *sua sponte* to narrow its statutory analysis of violations to Section 301.[8] In this regard, in terms of

_____

[7] The allusion to a "continuing violation theory" is imprecise, given that the water-to-water theory is one of both serial and continuing violations. In this regard, under the Department's understanding, a new violation occurs each time a contaminant enters a previously unaffected part of a water and each serial violation continues, relative to each affected part, as long as contaminants continue to enter.

[8] It is important to bear in mind that all of EQT's submissions to the court assumed, or at least allowed, that all of Sections 301, 307 and 401 could be applicable as bases for (continued…)

Section 307, the court reasoned that the leaks from EQT's impoundment did not qualify as a "discharge," which is the specified concern of Section 307. In support of this conclusion, the court borrowed a definition of "discharge" from DEP regulations implementing programing under the National Pollutant Discharge Elimination System ("NPDES"), *see* 33 U.S.C. §1342. This regulatory definition of "discharge" -- for purposes of the NPDES program -- concerns "[a]n addition of any pollutant to *surface waters* of this Commonwealth from a point source." 25 Pa. Code §92a.2 (emphasis added). Based on this definition, and because the industrial waste from EQT's impoundment initially infiltrated groundwater, and not surface water, the Commonwealth Court found that no discharge had occurred. *See EQT Prod. Co.,* 153 A.3d at 433-34. Again, the court's analysis was entirely of its own accord, as no party had suggested either that Section 307 did not apply, or that the NPDES-related definition of discharge was in any way relevant.

As to Section 401, the court posited -- based on the introductory title and without considering that the operative terms of the statute can be read more broadly than the title suggests -- that the provision concerned only forms of pollution other than industrial waste. *See id.* at 433 ("Because the release [from EQT's impoundment] emanated from an industrial site, the waste at issue is considered industrial waste, regulated under Article III of The Clean Streams Law, and not Article IV (relating to *other forms* of pollutants)." (emphasis added)).

Focusing, then, on Section 301, the Commonwealth Court highlighted the statute's proscription against "'plac[ing] or permit[ting] to be placed, or . . . permit[ting] to flow, or continu[ing] to . . . permit to flow, into any waters of the Commonwealth'

---

(…continued)
violations on the company's part, and the Department has consistently taken the position that EQT violated each and all of these provisions.

industrial waste." *Id.* at 434 (quoting 35 P.S. §691.301) (interlineations in original). By virtue of this language, the court reasoned that the General Assembly intended to expand the statute's coverage not only to discharges (as the court had narrowly defined the term), but also to instances in which industrial waste enters into the Commonwealth's groundwater or surface waters through other means. *See id.* ("This interpretation would cover situations where industrial waste escapes containment and flows over land into surface waters or leaks into the soil and enters the Commonwealth's groundwater."). Accordingly, the court concluded that Section 301's proscription applied to the leak from EQT's impoundment, based on the migration of contaminants through soil into groundwater. *See id.*[9]

The Commonwealth Court, however, proceeded to reject the Department's water-to-water theory of serial violations. Initially, the court expressed its concern that DEP's interpretation "would result in potentially limitless continuing violations for a single unpermitted release of industrial waste while *any* of the waste remained in any water of the Commonwealth, or until Act 2 remediation is completed." *Id.* at 435 (emphasis in original). According to the court, the General Assembly did not intend for these sections to establish "seemingly endless violations following but a single release of industrial waste or other prohibited substances from a point source or otherwise into a water of the Commonwealth." *Id.* at 435-36.

---

[9] To a degree, these passages of the Commonwealth Court's reasoning can be viewed as an implicit vindication of DEP's soil-to-water theory. They do not specifically address, however, a key aspect of the soil-to-water theory, namely, the Department's assertion that a violation continues even after a leak or other release has been redressed from the initial point of release, as long as contaminants continue to migrate into water.

Moreover, the Commonwealth Court opined that violations of the Clean Streams Law require some culpable action or inaction by violators. Thus, it was the court's position that passive movement of industrial waste cannot establish infractions. *See id.* at 436. Instead, the court indicated that violations are confined according to a concept of an "initial active discharge or entry of industrial waste into waters of the Commonwealth." *Id.* at 437.[10] For this reason, the court found that authorization was lacking for "ongoing penalties for the continuing presence of an industrial waste in a waterway of the Commonwealth following its initial entry into the waterways of the Commonwealth." *Id.*

In this regard, the Commonwealth Court opined that Section 301 simply was not concerned with the progress of remediation efforts after the cessation of what the court termed an "initial active discharge or entry of industrial waste" into waters. *See id.* at 436 ("Had the General Assembly intended that a violation of Section 301 . . . would result in a continuing violation until remediation is achieved, [it] would have clearly stated as such."). Relative to remediation, the court also highlighted DEP's powers, under the Clean Streams Law, to commence an action at law or in equity seeking abatement of nuisances in the form of contamination. *See id.* at 436-37 (citing 35 P.S. §691.601(a)). The court additionally alluded to the agency's authority to issue such orders as may be necessary to aid in the enforcement of the Clean Streams Law. *See id.* at 437 (citing 35 P.S. §691.610).

---

[10] It is not clear whether, by its use of the disjunctive, the Commonwealth Court meant to define "initial active discharge" in terms of entry into waters, or whether it viewed "discharge" and "entry" as separate triggers for violations. In either event, the litmus would not seem to discount the Department's soil-to-water theory, upon which the court was not focused in any event, since entry into waters is a determinative event under either understanding.

In further support of its construction of Section 301, the Commonwealth noted that penal statutes are to be strictly construed. *Id.* at 436 (citing 1 Pa.C.S. §1928). Additionally, the court rejected the Department's position that it was entitled to deference as the administrative agency charged with interpretation and enforcement of the Clean Streams Law. *Id.* at 436 n.23. *See generally Seeton v. Pa. Game Comm'n,* 594 Pa. 563, 578, 937 A.2d 1028, 1037 (2007) (discussing deference to agencies' interpretations relative to ambiguous statutes). In this respect, the court deemed the language of Section 301 to be sufficiently plain to override DEP's approach. Furthermore, the court considered the water-to-water theory to reflect a position developed in litigation, as to which deference should be constrained. *See generally Huntley & Huntley, Inc. v. Borough Council of Borough of Oakmont*, 600 Pa. 207, 228, 964 A.2d 855, 867-68 (2009).

After the issuance of the Commonwealth Court's decision, the EHB rendered an adjudication imposing a civil penalty upon EQT of $1,137,296. *See DEP v. EQT Prod. Co.*, No. 2014-140-CP-L, 2017 WL 2399756 (EHB May 26, 2017). The Board offered an extensive recitation of the facts relevant to the number and duration of the violations and the amount of penalties, finding EQT's conduct and omissions to have been reckless both in terms of the leaks and the timeliness and scope of the company's remediation response. *See, e.g.*, *id.* at *21, 48. In terms of the amount of the penalties sought by the Department at that juncture, the EHB alluded to a "proposed assessment through 9/25/2014 of $81,760,000." *See id.* at *26.

Material to the present dispute, the EHB differed with various lines of the Commonwealth Court's analysis. *See id.* at *25. In particular, the Board posited that Sections 307 and 401 both pertained to EQT's violations. As to Section 307, the EHB criticized the Commonwealth Court's resort to a limited-purpose definition of

"discharge." *See id.* (explaining that the definition relied upon by the Commonwealth Court "only applies to the Department's implementation of the federal NPDES program, which is not implicated here."). It was the Board's position that the leaks from EQT's impoundment plainly gave rise to a discharge as contemplated by Section 307 and otherwise within the Clean Streams Law. Indeed, the EHB observed that EQT's submissions had accepted that characterization. *See id.* The Board also expressed the view that, by prohibiting the unpermitted discharge of substances resulting in pollution, Section 401 proscribes unauthorized industrial-waste discharges. *See id.* at *30. On a broader plane, the EHB explained that, per its previous decisions, "a person may be guilty of violating multiple statutory provisions with one act, but separate penalties may not be imposed for the overlapping offenses unless one offense requires proof of a fact not required by the others." *Id.*; *accord* Brief for Appellant at 26 (positing, with reference to Sections 301, 307 and 401, that "[t]hese three sections . . . function together as comprehensive safeguards for the waters of the Commonwealth, in pursuit of the purposes of the statute: protection and restoration of those water resources").

With respect to Section 301, the EHB found the Commonwealth Court's reasoning and holding to be unclear, particularly in terms of its discussion of "active" releases.[11] Additionally, the Board expressed substantial reservations to the degree to which the Commonwealth Court rested its focus on a contaminant "leav[ing] one place," since the main concern of the Clean Streams Law is entry into "another place," *i.e.*, any of the waters of the Commonwealth. *Id.* at *27-28 ("It is not clear to us why it should matter legally whether the industrial waste escaped containment so long as the waste enters waters of the Commonwealth from outside waters of the Commonwealth."). In

---

[11] The EHB utilized the broad term "release" effectively to encompass all of the methods by which a contaminant may "leave one place" and "enter into another." *Id.* at *27.

this regard, the EHB appeared to express its own approval of the Department's soil-to-water theory. *See, e.g.*, *id.* at \*27 (explaining that some of the contaminants released from EQT's impoundment "did not travel directly into waters, but instead got bound up in soils and materials outside the pit but above groundwater in the unsaturated zone, only to be released into groundwater for the first time at a later date" and opining that "[s]uch discharges may be thought of as indirect discharges").

Nevertheless, "for reasons other than liability," the EHB decided to confine its penalty determination to exclude "periods when EQT's only new releases were strictly from the soils outside of the [impoundment]." *Id.* at \*28. The Board did not specifically focus on the water-to-water theory at large, albeit that it plainly differed with several of the Commonwealth Court's reasons for rejecting it as well as the court's ultimate test for liability. Various passages of the opinion, however, can be read as a rejection. *See, e.g.*, *id.* ("It is not clear to us why it should matter legally whether the industrial waste escaped containment so long as the waste enters waters of the Commonwealth *from outside waters of the Commonwealth*." (emphasis added)).[12]

## II. Analysis

The matters of statutory construction before us concern questions of law, over which our review is plenary. *See, e.g.*, *Six L's Packing Co. v. W.C.A.B. (Williamson)*, 615 Pa. 615, 629, 44 A.3d 1148, 1157 (2012).

---

[12] A dissenting opinion expressed concern that the adjudication did not consistently adhere to the Commonwealth Court's decision in the declaratory judgment proceedings. *See EQT Prod. Co.*, 2017 WL 2399756, at \*52-56 (Beckman, J.).

**A. The *Sua Sponte* Aspects of the Commonwealth Court's decision**

We begin by expressing substantial reservations about the Commonwealth Court's decision that Sections 307 and 401 were inapplicable to EQT's penalty exposure. For the same reasons discussed by the EHB, the Department vigorously argues that various provisions of the Clean Streams Law overlap, and that multiple violations may be committed through a single act or omission. *See* Brief for Appellant at 27-33.

It should be clear from the above that issues of environmental law can involve highly technical considerations and are best addressed by the courts on developed arguments by the litigants. As previously related, the Department and the EHB have expressed the colorable position that Sections 307 and 401 are relevant to acts or omissions by EQT in connection with the leaks from its impoundment, and they have offered potentially viable reasons why the Commonwealth Court's analysis of these statutes is incorrect. EQT never set out to discount the relevance of these statutes, nor does the company, in its present briefing before this Court, undertake to defend the Commonwealth Court's treatment.

Our concern with the *sua sponte* decision-making in this regard dovetails with the broader one that the declaratory judgment proceedings have strayed far afield from the pleadings and summary relief application and, in a number of respects, the attendant arguments as well. EQT was permitted to pursue a pre-enforcement challenge in the courts that came to interrelate with an anticipated proceeding before the EHB, on the ground that the company had been threatened by a Commonwealth agency with ballooning, multi-million dollar penalties based on a controverted theory that, in its broadest application, would expose the company to ongoing penalty liability as long as any contaminant deriving from its impoundment remained present in the environment.

*See EQT Prod. Co.*, 634 Pa. at 622, 130 A.3d at 759. The interrelationship with the EHB proceedings has obviously been a sensitive concern throughout. *See, e.g.*, *id.* at at 621-22, 130 A.3d at 759; id. at 622-28, 130 A.3d at 759-63 (Baer, J., dissenting) (expressing the position that judicial declaratory-judgment review should have been denied, and that the availability of any remedy to EQT should have been determined in the administrative civil penalty proceedings in the first instance, subject only to subsequent judicial appellate review).

Particularly in these circumstances, in our considered judgment, the declaratory judgment proceedings should have been confined more closely according to the pleadings and application for summary relief, prudentially, and arguably at least, as a matter of governing law. *See Christian v. Johnstown Police Pension Fund Ass'n*, 421 Pa. 246, 218 A.2d 746, 749 (1966) ("Authorities need not be multiplied in support of the rule that the relief afforded by [an equitable] decree[, such as a declaratory judgment,] must conform to the case *as made out by the pleadings*, and the decree must be consistent with the relief prayed for." (quoting *Snyder v. Barber*, 378 Pa. 377, 382-83, 106 A.2d 410, 412 (1954)) (emphasis in original).[13]

---

[13] It is not presently beyond reasonable dispute whether or not the doctrine set forth in the *Christian* decision continues to apply. Notably, the opinion preceded the promulgation of the Declaratory Judgment Act, 42 Pa.C.S. §§7531-7541, and the merger of the law and equity jurisprudence in the courts, *see* Pa.R.C.P. Nos. 1001(b), 1501 (note to rescinded rule), and therefore, a fresh consideration may be in order. Moreover, where a pleading encompasses a general prayer for relief -- asking, for example, for such other relief as the court may deem necessary and proper -- some modest elaboration from the pleading is permissible under *Christian*. *See Christian*, 421 Pa. at 246, 218 A.2d at 749-50. In this regard, EQT's complaint contained such a prayer, *see* Complaint in *EQT Prod. Co.*, No. 485 M.D. 2014 (Pa. Cmwlth.), at 11. However, the operative application on which the Commonwealth Court's decision was predicated, *i.e.*, EQT's application for summary relief, did not contain any such request. *See* Application for Summary Relief in *EQT Prod. Co.*, No. 485 M.D. 2014 (Pa. (continued…)

Accordingly, we deem it best, at this juncture, to simply vacate those portions of the Commonwealth Court's decision that exceeded the pleadings, the application for summary relief, and the arguments presented to the court, and which are matters on which we also have an incomplete adversarial presentation. Specifically, the Commonwealth Court's entire treatment of Sections 307 and 401 of the Clean Streams Law will be vacated, and we express no opinion as to the validity of its determinations in these regards. We observe only that, if and when those matters are revisited, the colorable positions expressed by the Board and the Department should be considered.[14]

---

(…continued)

Cmwlth.), at ¶18. Moreover, the deviations from the pleadings and application cannot be considered to have been modest.

Because of the complexities, and in the absence of argumentation on the point, we do not presently consider whether the doctrine expressed in *Christian* continues to apply. Rather, we rest our approach to the matters beyond the scope of the pleadings and application on prudential grounds, as discussed above.

[14] The Department also complains that the Commonwealth Court made factual assertions that are inconsistent with the denials in the agency's responsive pleadings, which are inappropriate to the summary-relief stage. *See* Brief for Appellant at 9-11. In its responsive brief, EQT offers no suggestion that there was not a factual dispute concerning these matters, nor does it make any effort to defend the resolution of disputed facts as appropriate to the summary-relief context.

All of the relevant denials pertain to the timing and efficacy of EQT's remedial efforts, matters which are not material to our present legal review. Nevertheless, since the Commonwealth Court should not have credited one party's statement of disputed facts, its decision will be vacated as it concerns those matters as well.

**B. The Water-to-Water Theory**

We proceed to the main focus of the Commonwealth Court's opinion -- the Department's water-to-water theory. Subject to reservations about addressing a matter at the summary relief stage that was not pursued by the proponent in the pleadings or the dispositive application, and based on a balancing of considerations, we will address this issue on the merits. In this regard, we observe that the Commonwealth Court ultimately was presented with robust adversarial presentations concerning this theory, as are we. The issue is also one of considerable public importance and has attracted the participation of a variety of *amici*, including, in support of EQT's position, the Chamber of Commerce of the United States of America, the Pennsylvania Chamber of Business and Industry, and the Greater Pittsburgh Chamber of Commerce -- and, for DEP, Clean Air Council, Chesapeake Bay Foundation, Inc., Citizens for Pennsylvania's Future, Sierra Club, the Pennsylvania Fish and Boat Commission, as well as a group of elected officials, organizations, and businesses with an interest in ensuring the clean water supply in Pennsylvania.

In the present briefing, DEP maintains its overarching position that the Clean Streams Law prohibits the continuing or indirect flow of unpermitted industrial waste or other substances causing pollution into *any part* of a water of the Commonwealth -- even after an initial release is corrected at the source -- and that the movement of contaminants from a given water (or a given part thereof) into another water (or part thereof) gives rise to serial violations. *See, e.g.*, Brief for Appellant at 18 (offering an example of flow of industrial waste from groundwater into a stream as a distinct violation). In this respect, the Department draws support from the statutory definition of "waters of the Commonwealth," which subsumes discrete waters and "parts thereof." 35 P.S. §691.1. According to the agency, it is entirely natural to speak of pollution

flowing from one body of water into another. Along these lines, DEP notes that a citation to a Webster's Dictionary definition of the word "into" proffered by EQT itself provides the following example of usage: "one stream falls or runs *into* another." Reply Brief for Appellant at 5 (quoting Brief for Appellee at 14 (citation omitted)) (emphasis in original).

The Department finds no material distinction between releases from an impoundment and the asserted "passive migration" of contaminants thereafter. The agency posits that the latter concept is specifically addressed by the Clean Streams Law's reference to "continuing to permit industrial waste to flow into waters of the Commonwealth." Brief for Appellant at 21. Further, DEP argues that the enactment anticipates, and prohibits, contamination by non-active means via its use of a series of passive verbs. *See, e.g.*, Brief for Appellant at 22 n.12 ("Passive language runs throughout The Clean Streams Law. Section 303, for example, refers to 'discharging' industrial waste or '*permitting* [it] to be discharged." (quoting 35 P.S. §691.303) (emphasis in original)). The agency criticizes the Commonwealth Court for "add[ing] words" to Section 301 by limiting its application to an "initial active discharge." *Id.* at 23.

DEP also explains that the civil penalty provisions in the Clean Streams Law apply "whether or not the violation was willful" and contemplate a daily, up-to-$10,000 penalty "for each violation." 35 P.S. §691.605(a). In light of these passages, and otherwise, the agency reasons that the Commonwealth Court erred in opining that violations require "some culpable action or inaction by the polluter," *EQT Prod. Co.*, 153 A.3d at 436. *See* Brief or Appellant at 34-35 ("The Clean Streams Law is a strict liability statute and, except for certain criminal violations . . ., the Department does not need to prove intent to pursue its enforcement remedies, including equitable actions seeking abatement of violations, civil penalties, and administrative orders.").

With reference to EQT's position that a violation occurs only when a contaminant moves from outside the waters of the Commonwealth into waters of the Commonwealth, DEP contends that this Court rejected such position in *Commonwealth v. Harmar Coal Co.*, 452 Pa. 77, 306 A.2d 308 (1973). In particular, the agency relies on the statement that "[n]othing in the Clean Streams Law" justifies the conclusion that "pollution occurs *only* when polluting substances are '*first* discharged into *any* waters of the Commonwealth.'" *Id.* at 89, 306 A.2d at 315 (emphasis in original; citation omitted; quotation adjusted). Additionally, the Department asserts that the Commonwealth Court effectively credited its position in some passages of its opinion, in particular, through the court's acknowledgement that the General Assembly intended Section 301's prohibition to cover not only direct discharges of industrial waste into surface waters, but also "instances where industrial waste enters into the Commonwealth's groundwater or surface water *through other means*." *EQT Prod. Co.*, 153 A.3d at 430 (emphasis added). The agency faults the Commonwealth Court for failing to follow its own reasoning to its logical conclusion: "Section 301 addresses situations where industrial waste enters groundwater or surface waters 'through other means' *e.g.*, from soil, bedrock, or part of another water of the Commonwealth." Brief for Appellant at 23-24.

The Department offers that its interpretation promotes the purposes of the Clean Streams Law, *i.e.*, to afford strong protection for the waters of the Commonwealth. 35 P.S. §691.4 (reflecting the declaration of policy attending the Clean Streams Law); *see also Adams Sanitation Co. v. Commonwealth*, 552 Pa. 304, 312, 715 A.2d 390, 394 (1998) ("[I]t is clear that the Legislature seeks to eliminate all water pollution in the Commonwealth to the extent possible."). To the extent that the Court might discern ambiguity, the Department elaborates on the policy underpinnings of the Clean Streams Law, *see* 1 Pa.C.S. §1921(c)(1), (3), (4), which encompass not only the prevention of

further pollution, but also reclamation and restoration "to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted." 35 P.S. §691.4(3) (declaration of policy). Citing to *Commonwealth v. Parker White Metal Co.*, 512 Pa. 74, 515 A.2d 1358 (1986), the Department contends that broad enforcement powers, on its part, are essential "to battle the tide of pollution and environmental catastrophe" and "foster the environmental well-being of the Commonwealth of Pennsylvania." Reply Brief for Appellant at 15-16 (quoting *Parker White Metal Co.*, 512 Pa. at 97, 515 A.2d at 1370).

DEP additionally highlights the presumption in favor of the public interest over private ones, *see* 1 Pa.C.S. §1922(5), and the directive for courts to construe remedial statutes broadly to effectuate their purposes, *see* 1 Pa.C.S. §1928(c). Responding to the assertion that the statutory regime should be strictly construed in light of its penal attributes, DEP emphasizes that the substantive, remedial provisions of the Clean Streams Law are expressed separately from the penalty provisions. *See Commonwealth v. Monumental Prop.*, 459 Pa. 450, 461, 329 A.2d 812, 817 (1974) (relating that the legislative emphasis, relative to strict or liberal construction, "is on provisions, not statutes in their entirety"). The agency also explains that the Legislature has undertaken to increase penalties over time, demonstrating its intention to fortify the statute's environmental protections. In this regard and otherwise, the Department invokes the principle of deterrence. *See, e.g.*, Reply Brief for Appellant at 22 ("The potential for appropriate penalties will induce parties to take additional precautions *before the fact* to protect water resources, and the threat of ongoing liability will induce a party to complete a clean-up as quickly as possible." (emphasis in original)).

Turning to the consequences of a vindication of the Commonwealth Court's decision, *see* 1 Pa.C.S. §1921(c)(6), the Department posits that the opinion nullifies the General Assembly's intent in enacting the Clean Streams Law. In this regard, DEP

indicates that its authority is limited to remedying violations of the enactment, and, under the Commonwealth Court's interpretation, there would be no violation relative to waters remote from an initial entry point, even when severe pollution persists there after the cessation of an initial active discharge. *See, e.g.*, Brief for Appellant at 50 ("By creating a gaping hole in the substance of the statute, EQT's approach would neuter the Department's power to enforce the statute.").

In terms of the allusions to limitless continuing violations, the Department points to procedural safeguards, such as the interposition of the Board as the quasi-judicial body determining penalties, and the allocation of the burden of proof of violations to the agency. According to the Department, moreover, it is its practice to cap its claims for civil penalties when a remediator has demonstrated attainment of the standards under Act 2. Finally, DEP maintains that its administrative interpretation is entitled to deference by the courts.

EQT, for its part, defends the Commonwealth Court's construction of the Clean Streams Law, to include the confinement of penalties according to the duration of an initial active discharge. It is the company's position that each of Sections 301, 307 and 401 prohibit "specified actions" causing an industrial waste or a substance resulting in pollution to enter "*into* any of the waters of the Commonwealth." Brief for Appellee at 13 (emphasis in original). EQT defines "into," in this regard, as "moving from outside to the inside of an object." Brief for Appellee at 14 ("It is certainly not common to consider movement of material within water to be an entry 'into' water.").

The company further notes the absence of any language, in the Clean Streams Law, specifically describing or prohibiting the movement of pollutants from one part of water to another. *See id.* at 26 ("Nothing in the CSL states or suggests that a violation occurs when a pollutant merely remains, moves or flows within water."). In this regard,

EQT observes that, in other statutes, the General Assembly has specifically addressed the concept of migration. *See id.* at 27 n.10 ("The General Assembly knows how to address migration in express terms when it intends to do so[.]" (citing 35 P.S. §6026.307(b) (describing environmental mitigation measures including "actions to prevent the migration of regulated substances")).

EQT also emphasizes the statutory focus on "any of the water*s*" (as opposed to "any water"). 35 P.S. §691.301 (emphasis added). The company argues that this demonstrates contemplation of a collective group of waters, "the entry into any one of which is a violation." Brief for Appellee at 15. Along these lines, EQT also relies on the use of the word "all" within the statutory definition of waters of the Commonwealth. *See id.* at 25 ("Because 'all' waters are 'waters of the Commonwealth,' the Department's theory cannot be employed unless the word 'all' is deleted from the definition, making its interpretation improper."). Moreover, according to the company, because the Legislature did not explain where one part of a water begins and another ends, it "could not have intended for courts or the regulated community to speculate what these undefined terms mean to determine where 'parts' of water begin and end to determine penalty liability." *Id.* at 26-27.

EQT does submit to the Department's authority relative to the abatement of pollution. *See, e.g.*, *id.* at 18 ("Persons violating[, *inter alia*, Sections 301, 307, and 401] are subject to both penalties *and any other enforcement actions necessary to abate pollution and nuisance.*" (emphasis added)). In this regard the company depicts the Department's treatment of its own enforcement powers as "an attempt[] to read [them] out of the [Clean Streams Law]." *Id.* at 35. It is EQT's position, however, that "[t]he unavoidable and natural dispersion of contaminants within waters of the Commonwealth

is to be addressed through enforcement other than penalties[.]" *Id.* at 18.[15] In this respect, EQT observes that the penalty provisions of the Clean Streams Law are not tied to any cleanup standard and argues that those provisions "cannot, therefore, be tied to the time or manner by which industrial waste or pollution is removed from waters of the Commonwealth." *Id.* at 19.[16]

Like the Commonwealth Court, EQT stresses the concern that there is no limiting principle under the Department's theory, other than agency discretion. *See, e.g.*, *id.* at 24 ("This concept of liability would result in limitless continuing penalties for a single release as long as any molecule of the substance remains in any water of the

---

[15] EQT does not relate its general reference to "unavoidable" events to the circumstances of the leaks from its impoundment and the consequent contamination of Commonwealth waters, and the Department takes the opportunity to respond by highlighting the EHB's findings of recklessness on the company's part. *See, e.g.*, Reply Brief for Appellant at 21.

[16] EQT's brief also includes a discussion of the legislative history of the civil penalty provision of the Clean Streams Law, in which the company asserts that the replacement, in 1976, of a $500 levy "for each day of continued violation" with a $10,000 penalty "per day for each violation" evidences the Legislature's intent to eliminate the concept of a continuing violation. *See* Brief for Appellee at 19-22 (discussing Act of Oct. 7, 1976, P.L. 1099, No. 222). The company's brief, however, appears to accept that one who fails to terminate an initial active discharge of industrial waste into waters of the Commonwealth commits a continuing violation and incurs daily penalties until the cessation of such initial active discharge or entry. Indeed, in some passages of its brief, the company ties cessation to the point "when the industrial waste no longer enters into waters of the Commonwealth." *Id.* at 9. Thus, EQT's arguments appear to go to the scope of continued violations and to the fact of serial ones, rather than to the possibility of a continued violation in the abstract. *Accord id.* at 17 (indicating that "*each day of violation* under Section 301, 307 or 401 of the Clean Streams Law requires proof of entry into waters of the Commonwealth." (emphasis added)); *id.* at 34 (recognizing that a violation may span "one day or one hundred days").

Accordingly, we view the contemplated distinction between imposition of daily penalties for a "continued violation" and a penalty "per day for each violation" as unpersuasive.

Commonwealth."); *id.* at 54 ("Given the detection technology now available and the ability to analyze various constituents at parts per billion and parts per trillion concentrations, neither [EQT] nor any other party cleaning up contaminated sites in the Commonwealth could ever achieve a cleanup that would preclude the perpetual penalty liability posited under the Department's interpretation."). The company characterizes the Department's allusions to its asserted practice of tying penalties to Act 2 cleanup standards as "self-serving" and capable of revision at any time. *Id.* at 28 ("The Department simply says that responsible parties should trust the Department's 'practice' and the Environmental Hearing Board to be reasonable."). EQT envisions that liability should turn on actions or inactions of those who release contaminants, not passive movement of substances in the environment and the complexity of affected water systems. *See id.* at 32 ("The General Assembly could not have intended the absurd result that 'parts' of groundwater, or parts of a surface water body, must be delineated and described by experts for persons to have notice of, or for the Department, the Environmental Hearing Board, or any court to determine, when, where or how violations occur."); *see also id.* at 37 ("The Commonwealth cannot accomplish its purpose of a vibrant economy if business and property owners are held to excessive and unreasonable standards, subject to penalties in perpetuity for conditions that may well be entirely beyond their ability to control.").

EQT regards the civil penalty regime as a penal statute that must be strictly construed in a manner that provides clear notice of unlawful conduct and potential penalties, *see* 1 Pa.C.S. §1928(b)(1), and it argues that the Department's theory is not entitled to deference, because it lacks the power to persuade. Additionally, the company posits that the severe penalty exposure contemplated by the Department would chill business activities, as well as voluntary efforts to remediate pollution. *See,*

*e.g.*, Brief for Appellee at 56 ("The Department's interpretation would nullify the environmental liability protection afforded by Act 2 and significantly curtail the future redevelopment of thousands of former industrial and commercial sites, which is antithetical to the very purpose of Act 2.").

### 1) Ambiguity

We begin with the conclusion that Clean Streams Law is ambiguous as it relates to the ongoing migration of previously-released contaminants among the waters of the Commonwealth and their many parts.

Legislative enactments reposed in the vital arena of environmental protection present difficult challenges for the judiciary. Many courts have observed the imprecision integrated into such statutes. In the first instance, operative terms and phrases that are frequently used -- such as, here, "discharge" and "permit to flow" -- would appear to overlap. *Cf. Carson Harbor Vill., Ltd. v. Unocol Corp.*, 270 F.3d 863, 878-79 (9th Cir. 2001) (observing a similar overlap between the terms "discharge" and "release" as employed in a federal environmental protection statute). These terms and phrases are also inexplicit concerning whether, or to what degree, they may encompass movement beyond the realm of human direction or control. *See, e.g.*, *id. at* 878 (explaining, with reference to terms including discharge, release, and disposal, that "one can find both 'active' *and* 'passive' definitions for nearly all of these terms in any standard dictionaries" (emphasis in original)).[17] Concomitant to the efforts of legislatures to

---

[17] The same holds true for the use of the word "permit" in Section 301, as it is used in the phrases "permit to flow" and "continu[ing] to . . . permit to flow." While certainly "permit" can be used in some contexts in a wholly passive manner, in others it has been defined to "require a willful act or a willful failure to act in the face of a clear opportunity to do so." *United States v. Semenza*, 835 F.2d 223, 224 (9th Cir. 1987) (also noting that the word "allow" -- a synonym to "permit" -- "has no rigid or precise meaning" (quoting BLACK'S LAW DICTIONARY 70 (5th ed. 1979)).

implement broad-scale protections for the environment, many important details have been left to judicial and administrative interpretation.

Some courts have interpreted phrases such as "discharge" and "release" in the environmental context as encompassing "movement from a place of confinement to another place where there is no confinement." *Consumer Advocacy Grp. v. Exxon Mobile Corp.*, 128 Cal. Rptr. 2d 454 (Cal. Ct. App. 2002) (relying on various dictionary definitions). We find this to be a natural reading of the Clean Streams Law, in that discharging or permitting to flow or continuing to do so, directly or indirectly, into waters of the Commonwealth, can reasonably be viewed from the point of the initial release and entry into water. It is less natural, in our view, to view discharges and other forms of release as also entailing serial entries into different waters of the Commonwealth as contaminants migrate through parts of those waters. *Accord DEP v. EQT Prod. Co.*, No. 2014-140-CP-L, 2014 WL 5591063, at *6 (EHB Oct. 28, 2014) ("'Passive migration' seems different than entry into waters of the Commonwealth.").

For example, one who has contained a leak, or stopped the movement of contaminants at the source, can be said to have ceased their release.[18] Of course, the statutory scheme embodies a broader conception of release to encompass, or to be attended by, movement "into any of the waters of the Commonwealth." 35 P.S. §§691.301, 691.307, 691.401. But, incorporating this perspective, once contaminants no longer pass through the initial point of entry into water, it is reasonable to say that the

---

[18] In this instance and hereinafter, we use the term "release," for the sake of convenience, to connote discharges, permitting to flow, and continuing to discharge or permit to flow, all directly or indirectly. Consistent with the manner in which EQT framed its case for declaratory relief, *see supra* note 8, we also assume that the leaks from the company's impoundment, coupled with their initial entry into protected waters, implicate the above terms and phrases in a manner that is sufficient to constitute at least one violation of each of Sections 301, 307 and 401.

substances are no longer being released into any of waters of the Commonwealth on that pathway.  The close association between the terms and phrases connoting release and the depiction of movement into any of the waters of the Commonwealth supports this understanding of the statute.[19]

On the other hand, the Clean Streams Law does bear the Department's interpretation as well.  Notably, none of EQT's technical arguments based on the language of the statute reveal an incontrovertible meaning.  For example, as the Department observes in its reply brief, the company's own reference to a dictionary definition of "into" portrays movement from one water into another.  *See* Brief for

---

[19] To the extent that Justice Donohue relies on the continue-to-permit-to-flow language to demonstrate that the statute's prohibition is not limited to the initial release of waste, we take no issue with this point.  Certainly, as long as industrial wastes are permitted to continue to flow into waters of the Commonwealth a continuing violation occurs.  We are not persuaded, however, that the statute plainly excludes a distinction between continuing violations and serial, remote ones premised on discrete entries into different waters or parts thereof.  *Accord EQT Prod. Co.*, No. 2014-140-CP-L, 2014 WL 5591063, at *6 ("'Passive migration' seems different than entry into waters of the Commonwealth.").

Justice Donohue appears to suggest that the continue-to-permit-to-flow phraseology is capable of only a single understanding predicated upon a violator's conscious allowance of the flow of industrial waste "without taking any action to stop it." Concurring and Dissenting Opinion, *slip op.* at 2-3 & n.2.  As Justice Donohue otherwise recognizes, however, even the agency charged with enforcement authority for the statute maintains a different interpretation.  In this regard, DEP posits that the relevant statutes entail strict liability throughout, such that knowledge and an active response to abate (short of full remediation) are irrelevant to liability exposure.  *See* Brief for Appellant at 34-35 (rejecting the position of the Commonwealth Court that violations require culpable action or inaction by a polluter).

We, of course, do not mean to suggest that DEP's interpretation must be deemed controlling, as again, we are focused on demonstrating the ambiguity in this complex series of environmental regulatory statutes containing many undefined terms carrying multiple potential connotations.

Appellee at 14 (quoting Webster's Dictionary as offering as an example of the usage of the word "into" "as . . . one stream falls or runs into another"). By way of another example, EQT's reliance on Section 301's reference to "any water*s* of the Commonwealth" (as opposed to "any water"), downplays the status of "waters of the Commonwealth" as a defined term. In this regard, substituting that definition into Section 301 yields the following legislative expression:

> No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into *any of* the [*any and all* rivers, streams creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs and all other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural or artificial . . .] any industrial wastes, except as hereinafter provided in this act.

35 P.S. §§691.1, 691.301.

The operative terms of Section 301 thus reduce to release into "any of the any and all" bodies or channels of water or parts thereof, and even EQT recognizes that the language subsumes "any one." Brief for Appellee at 15. Accordingly, the company's arguments provide no plain-meaning, textual basis to discount the Department's theory that every time contaminants move into "any one" of the many parts of the waters of the Commonwealth from anywhere else (including another part of a water) after having been released by a violator, a serial violation occurs.[20]

---

[20] There are many cases reflecting the ambiguity of the word "any," which appears repeatedly in the operative terminology discussed above. *See, e.g.*, *Shue v. Nevada*, 407 P.3d 332, 336 (Nev. Dec. 14, 2017) (commenting that "any" can mean one; one, some, or all regardless of quantity; great, unmeasured, or unlimited in amount; one or more; and all (citation omitted)).

The other limiting principle suggested by the arguments of EQT and its *amici* is premised on the company's passivity at points of entry remote from the place of initial release and entry into a protected water. *See, e.g.*, Brief for *Amici* Chamber of Commerce of the U.S.A., Pa. Chamber of Bus. & Indus., and the Greater Pittsburgh Chamber of Commerce at 6 ("The specific verbs the statute employs -- 'put,' 'place,' 'discharge,' and 'flow' -- all focus on the action of a person introducing a pollutant into waters in Pennsylvania[.]"). As previously explained, however, operative terms within each of Sections 301, 307 and 401 may be read to carry passive connotations. *See, e.g.*, *Carson Harbor Vill.*, 270 F.3d at 878. In this vein, neither EQT or its *amici* have provided any developed reasoning -- at least relative to the point of the initial release of industrial waste from the company's impoundment -- to controvert the Department's assertion that the Clean Streams Law imposes a form of strict liability. And, as a matter of strict but-for causation at least, one who has released a contaminant into one water can also be said to have released it indirectly into another as well, as the substance migrates from water to water. We therefore disagree with EQT and its *amici* that the plain terms of the statute exclude the meaning ascribed to it by the Department.

What is plain that the Legislature used broad terms and phrases to prohibit the unauthorized release of industrial waste into any of the waters of the Commonwealth, and that the design was to protect the entire sphere, including each and every part. We conclude, however, that it is not apparent from the face of the statute whether the General Assembly contemplated doing so via a litmus focusing on preventing movement into any discrete water or part, thereby also protecting the other waters at large, or if it wished to serially sanction movement among waters (and their parts) after the fact of an initial violation.

**2) Resolution**

Of the competing constructions, we find it most reasonable to conclude the Legislature was focused on protecting the waters of the Commonwealth with reference to the places of initial entry. Again, we find this to be the most natural reading of the statute. Moreover, we agree with EQT that, had the General Assembly intended differently, it would have been a simple matter to address water-to-water migration in express terms. At the very least, had the Legislature wished to codify the water-to-water theory, it could have sanctioned movement of contaminants "into *or among*" any of the waters of the Commonwealth, rather than merely "into" any such waters.

Clarity, in this respect, is particularly implicated in light of the scale of the penalty exposure generated under the Department's contrary construction of the statute. DEP's theory contemplates serial and continuing daily civil penalties of up to $10,000 per day, as well as potential criminal liability, for each pool of groundwater, finger of a lake, branch of a stream, crook of a rivulet, ditch among a series of ditches, or any other part of any of these that the agency may be able to identify, however the agency may construe the concept of a part of a water. *See* 35 P.S. §691.1 (definition of "Waters of the Commonwealth"). This is, of course, in addition to the cost of remediation borne by violators. And, since Sections 301, 307, and 401 do not address remediation standards, liability exposure would persist even after all relevant cleanup requirements were met, as long as some microscopic amount of contaminants might remain present to move among waters and parts of waters.[21] It is worth noting, as well, that the

---

[21] The Department points to an informal practice, on its part, to cap its claims for civil penalties, at the latest, when a remediator has met Act 2 cleanup standards. *See* Brief for Appellant at 59. As EQT and its *amici* relate, however, it is not reasonable to suggest that persons and businesses assessing whether to assume the risk of incurring strict liability exposure on the scale envisioned under DEP's construction of the actual terms of the governing statutes should rely on a regulatory agency's discretionary, (continued…)

maximum $10,000 civil penalty was far more potent when it was added to the Clean Streams Law in 1970 by the Legislature, and when that figure was extended in 1976 to daily continuing violations.[22]  *See* U.S. Dep't of Labor, Bureau of Labor Statistics CPI Inflation Calculator (available at https://www.bls.gov/data/inflation_calculator.htm) (relating that $10,000 had the same buying power in 1970 as approximately $65,000 today).

We appreciate the critical need for protection to vindicate the constitutional entitlement of the citizenry to a clean environment and recognize that the Clean Streams Law is designed as a mechanism to advance this salutary objective.  *See* PA. CONST., art. I, §27.  Nevertheless, and at bottom, we believe that if the General Assembly wished to create the sort of massive civil penalty exposure administered by the Department on a strict-liability basis, *see* Brief for Appellant at 34, it would have said so more expressly.  In the absence of such clarity, we find the agency's expansive construction of a statute that is inexplicit in such regards to be too unreasonable to support an affordance of deference.  *Cf. General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) (explaining that, when sanctions are drastic, "'elementary fairness compels clarity' in the statements and regulations setting forth the actions with which

---

(…continued)

informal, and potentially transient practices.  *See* Brief for Appellee at 55; Brief for *Amici* Chamber of Commerce of the U.S.A., Pa. Chamber of Bus. & Indus., and the Greater Pittsburgh Chamber of Commerce at 9-11.

[22] *See* Act of July 31, P.L. 653, No. 222, §16; Act of Oct. 7, 1976, P.L. 1099, No. 222, §1.

the agency expects the public to comply" (quoting *Radio Athens, Inc. v. FCC*, 401 F.2d 398, 404 (D.C. Cir. 1968)).[23]

We also do not regard the decision in *Harmar Coal* as controlling. That case concerned the application for a permit to authorize pumping of untreated acid mine drainage from places of relative containment (the bases of coal mines) into surface waters of the Commonwealth. *See Harmar Coal*, 452 Pa. at 80-82, 306 A.2d at 310-11. The Court simply did not consider the validity of a serial-violation theory predicted on remote instances of contaminants moving from uncontained parts of waters into other parts of waters. *See generally Oliver v. City of Pittsburgh*, 608 Pa. 386, 395, 11 A.3d 960, 966 (2011) (explaining that the holding of a judicial decision is read against its facts) (citing *Commonwealth v. McCann*, 503 Pa. 190, 195, 469 A.2d 126, 128 (1983))).

In terms of the Department's enforcement powers relative to abatement and remediation, we agree with EQT that the agency's present submissions understate the breadth of its authority. We recognize that some of DEP's powers are keyed to violations, *see, e.g.*, 35 P.S. §691.401, such that, if there is no specific violation relative to a particular water, enforcement under those particular provisions relative to that water would not be implicated under a strict reading. The Clean Streams Law, however, has armed the Department with multiple tools to require remediation by those who may have released polluting substances into the waters of the Commonwealth. *See, e.g.*, 35 P.S. §691.503 ("[W]henever . . . a pollution [associated with a violation of the orders and regulations of the Department] shall be maintained or continued contrary to such orders

---

[23] Among the other reasons for suggesting that liability is not limitless, discussed above, DEP also points to a five-year statute of limitations. *See* Reply Brief for Appellant at 12. The agency offers no explanation, however, concerning when liability accrues, for purposes of the commencement of the limitations period, relative to continuing and serial violations.

and regulations, the same may be abatable in the manner provided by this act."). DEP has also implemented various legislative regulations requiring immediate remedial action relative to dangers caused by incidents involving the release of substances causing pollution, *see, e.g.*, 25 Pa. Code §91.33(b), which are absent from its submissions here. Additionally, the Department has not discussed its authority relative to the abatement of pollution in the form of a common-law public nuisance. *See Commonwealth v. Barnes & Tucker Co.*, 455 Pa. 392, 410-14, 319 A.2d 871, 881-83 (1974). Finally, nothing in this opinion should be read to constrain a broad reading of the Clean Streams Law relative to administrative powers of enforcement pertaining to the abatement and remediation of pollution, as presently we are focused on aspects of the statute that are integrally interrelated with its penalty provisions.[24]

In terms of the applicable principles of statutory construction, we rely substantially on consideration of the consequences of a particular interpretation, *see* 1 Pa.C.S. §1921(c)(6), and the presumption that the General Assembly does not intend a result that is unreasonable, *see id.* §1922(1). As to reasonableness, we have no intention to suggest that the General Assembly could not, subject to constitutional limitations, impose upon a water-to-water theory of serial, ongoing violations. We have found it unreasonable, however, to believe that it would have chosen to do so absent clear and explicit notice signaling the potential scope, scale, and duration of the liability exposure.

---

[24] It might go without saying that we respectfully differ with Justice Donohue's portrayal of our opinion as an effort to promote "proportional penalties" at the "expense of abating pollution." Concurring and Dissenting Opinion, *slip op.* at 7-8.

## C. The Soil-to-Water Theory

The Department's present arguments subsume its soil-to-water theory of continuing liability, *see, e.g.*, Brief for Appellant at 23-24, but most of its presentation is centered on the water-to-water theory, and EQT does not directly respond to the soil-to-water theory as such. Moreover, despite having commenced the declaratory judgment action specifically to address this theory, the company did not carry that effort into the summary relief stage. Furthermore, some of EQT's present arguments would seem to be consistent with the theory. *See, e.g.*, Brief for Appellee at 17 (positing that liability for civil penalties under the Clean Streams Law "attaches to the entry of the pollutant into waters of the Commonwealth, and it ends when such entry ends"). In other passages, however, the company does maintain its focus on "some action or inaction by the polluter to give rise to a violation." *Id.* at 51.

Because the contours of civil penalty liability based on the migration of contaminants through soil into water are not sharply in focus before us, as with the Commonwealth Court's determinations pertaining to Sections 307 and 401, we decline to address the matter here. In this regard, we incorporate our previous prudential concerns, while noting that the soil-to-water theory would appear to be at issue in the Commonwealth Court's pending review of the EHB's penalty determination.

## III. Mandate

The Commonwealth Court's decision is affirmed to the extent that it is consistent with the declaration below and is vacated in all other respects.

The *mere* presence of a contaminant in a water of the Commonwealth or a part thereof does not establish a violation of Section 301, 307, or 401 of the Clean Streams Law, since *movement* of a contaminant into water is a predicate to violations. This

statement pertaining to the governing legal standard is distinct from whether and to what extent presence may serve as evidence of movement. *See supra* note 5.

The Department's water-to-water theory of serial violations is rejected on the terms discussed in this opinion.

Nothing in this opinion should be read to approve or discount the Department's soil-to-water theory.

Jurisdiction is relinquished, and these declaratory judgment proceedings are terminated.


Justices Baer, Todd, Wecht, and Mundy join the opinion.

Justice Donohue files a concurring and dissenting opinion in which Justice Dougherty joins.